IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KIMBERLY WOODRUFF, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.: 2:18-cv-00514-ALB |
| JACKSON HOSPITAL & CLINIC, INC., | ) | |
| Defendant, | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kimberly Woodruff ("Plaintiff") filed a complaint alleging that Defendant Jackson Hospital ("Defendant") fired her for belonging to a protected class. The single count alleges that Jackson Hospital subjected Woodruff to adverse employment actions based on her race. *See* Doc. 1 at ¶18. This matter comes before the Court on Defendant Jackson Hospital's motion for summary judgment. (Doc. 20). Upon consideration, the motion is GRANTED.

## BACKGROUND

The following facts are taken in the light most favorable to the nonmovant.

The events of this case occurred in the cardiology office of Dr. Beverly Stoudemire-Howlett[1] within the Jackson Clinic, a specialty physician clinic operated by Jackson Hospital. Dr. Stoudemire is an African-American woman. Kimberly Woodruff, a white woman, was hired by Jackson Hospital on February 14, 2017 as one of the support staff for Dr. Stoudemire. Woodruff was to serve as a "clinical documentation coding specialist" and her duties included both the positions of medical assistant and scribe. Dr. Stoudemire specifically recruited Woodruff for this position because they had worked together before.

After Woodruff was hired, Jackson hired three more employees to work in Dr. Stoudemire's practice. These employees were Jo Guice, Nikkita Moulton, and Rhonda Burns. Guice, Moulton, and Burns are African-American women. The core of Woodruff's complaint is that these three women subjected her to harassment because of her race.

During the seven-month period that Woodruff worked for Dr. Stoudemire, she alleges that these three co-workers subjected her to severe and pervasive racially discriminatory harassment. Woodruff testified that Moulton, Burns, and Guice frequently ignored her in the office or made her do things that were outside her job description, rendering it impossible to accomplish her work tasks. She also testified

---

[1] The witnesses refer to Dr. Stoudemire-Howlett as "Dr. Stoudemire," so the Court will as well.

2

that these women fabricated stories about her, which included tales of office incompetence and an affair with one of her supervisors.

More importantly for her present claims, Woodruff identified five specific actions of alleged race-related harassment, four that she experienced and one experienced by the clinic secretary, Naomi Moses. Woodruff could not identify precisely when these events occurred, and the following list of events is not meant to be in chronological order except where noted.

First, at some point, Moulton and Burns told Woodruff that an African-American patient had complained of poor treatment at her hands and that the patient believed the basis of this poor treatment was Woodruff's "unfriendl[iness] to African-Americans." *See* Doc. 26-2 at 120.

Second, at some point in April or May of 2017, Dr. Stoudemire approached Woodruff individually to assure her that she, Dr. Stoudemire, was "not a racist." *Id*. at 125. Shortly before or after giving Woodruff this assurance, Dr. Stoudemire convened a meeting of her subordinates and made clear that she needed them to get along and focus on their jobs. *Id*. at 116-119. Woodruff alleges that, during this meeting, Dr. Stoudemire said she "wanted all of us to work together," "wanted a multiracial clinic," and "didn't want an all African-American office." *Id.* at 117.

Third, on one or more occasions in June of 2017, Guice, Moulton, and Burns discussed current events in the office, including the removal of Confederate statues.

3

Guice, Moulton, and Burns generally supported the removal of such statues, believing them to represent a reminder of slavery. Woodruff's response was that "it was history, and I didn't go any further into their conversation" but "[t]he three labeled me as unfriendly to blacks." *See* Doc. 21 at 5.

Fourth, at some point during the discussion of the statues, Burns took the position that everyone suffers from some degree of racism, and she confessed that she was a racist under this theory.

Fifth, at some point, Moses overheard Guice, Moulton, and/or Burns making comments about the "privilege" and demands of their white patients. *See* Doc. 26-6 at 70.

Woodruff told Luke Brooks, who served as the Jackson Clinic's operations manager as well as Woodruff's supervisor that she was experiencing a hostile work environment. She testified that she sent him an email complaining explicitly of racial discrimination in early August of 2017, followed by a text message on August 29. Woodruff texted him requesting a solution to what she termed a "hostile work environment." After Woodruff met with Brooks and told him that her co-workers were not talking to her, Brooks failed to escalate the issue and took no corrective action.

Woodruff experienced three disciplinary sanctions, culminating in her termination. First, on June 13 she met with Kelin Penney, the administrator of the

4

Jackson Clinic, and Luke Brooks, who informed her of complaints that she was unskilled at managing her time and prioritizing tasks and that she lacked focus. At this first meeting, Woodruff was informed that if she did not improve immediately she would be terminated. On September 6, Woodruff was disciplined for using improper abbreviations and making mistakes regarding the scheduling of catheterization work with a lab. This was to be her final warning.

Finally, Woodruff was terminated on September 14, after exactly seven months on the job. Kim Sport, a representative from Zoll, a medical supply company that produces defibrillator vests prescribed by Dr. Stoudemire, had asked Woodruff to show her the medical information of two patients, which Zoll was entitled to under HIPAA. After Woodruff showed her the records, Sport spoke to Guice about closing a chart and commented to her about the number of charts she had seen open in the database. Guice then reported to the hospital administration that Woodruff had allowed Sport greater access to patient information than was authorized. After no investigation, Woodruff was fired and put on a no-hire registry.

## **STANDARD**

The court will grant summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). The moving party need not produce evidence disproving the opponent's claim; instead,

the moving party must demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In turn, the nonmoving party must go beyond mere allegations to offer specific facts showing a genuine issue for trial exists. *Id.* at 324. When no genuine issue of material fact exists, the court determines whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## **DISCUSSION**

The wording of Plaintiff's complaint does little to tell the Court what specific cause of action she is asserting. It provides only that "Defendant's actions toward her violated her right to be free of race discrimination in employment." *See* Doc. 1 ¶18. Defendant treats this single allegation as both (1) a hostile work environment claim and (2) a *McDonnell-Douglas* discriminatory discharge claim. Assuming for the sake of argument that Plaintiff has sufficiently alleged those claims, neither one survives summary judgment.

A. <u>Hostile Work Environment</u>

To make out a prima facie case of hostile work environment employment discrimination based on race, a plaintiff must show that (1) she belongs to a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on her race, (4) the harassment was sufficiently severe or pervasive to alter the terms of her employment and create a hostile work environment, and (5) the employer is

6

responsible for the environment under a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). The Court will assume for the sake of argument that Plaintiff can establish 1, 2 and 5 because her claim clearly fails at steps 3 and 4.

To survive summary judgment on a Title VII hostile work environment claim, Plaintiff must produce substantial evidence that she suffered severe and pervasive harassment based on a protected characteristic, in this case the color of her skin. In the Eleventh Circuit, a plaintiff attempting to make out this cause of action must show that but for her protected characteristic, she would not have been the object of harassment. *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982). Although statements or conduct will not be considered relevant unless they are tied to a protected characteristic, the inquiry is one that "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) (adopting in a racial context the language of *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

Plaintiff's evidence that her race explains the treatment she endured comes from the depositions of herself and her co-worker, Naomi Moses. Woodruff principally testified about being ignored and inconvenienced by her co-workers.

7

This behavior has been encountered by courts in this Circuit before and held insufficient to state a claim. *See Gonzalez v. DeKalb Med. Ctr.*, 2009 WL 10664894, at *14 (N.D. Ga. Dec. 30, 2009) (holding that ostracism is insufficient). While the facial neutrality of conduct is not fatal, under a holistic analysis, to a showing that it was based on a protected characteristic, *id.* citing *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002), there must be substantial evidence that, taken together, provides a reasonable inference that the actions had a racial basis.

Woodruff had every incentive during her deposition to be as forthcoming as possible with examples of the racial harassment she allegedly suffered. Yet she could only muster a total of four incidents over the seven-month period of her employment. First, a co-worker stated that a patient had complained that Woodruff was unfriendly to African-Americans. *See* Doc. 26-2 at 120. Second, Dr. Stoudemire approached Woodruff and assured her that she wasn't racist and wanted a multi-racial staff. *See id.* at 126. The third and fourth instances appeared to have occurred at the same time. *See id.* at 119. During one conversation, Woodruff's co-workers disagreed with her about the removal of Confederate statues and then Burns said that everyone has some degree of racism in them. *See id.* at 109. Woodruff confirmed that, other than these four instances, there was not a single example of racially charged conduct in her presence:

**Question**: Tell me everything that any of those three ladies said to you or in your presence that was racially hostile.

**Answer**: I can't recall anything other than what I told you already.

**Question**: And in the affidavit that you gave to the EEOC, the two things you listed were the comment from Rhonda about everyone's racist to which you responded I don't think that's the case; correct? That's in the affidavit.

**Answer**: Right.

**Question**: And then, secondly, the comments about Robert E. Lee removal -- removal of the statute -- statue. Let me ask that again. The two comments that you put in your affidavit were the comment that everyone has some racism; correct?

**Answer**: Correct.

....

**Answer**: Nikita Molton made comment that a patient -- or that they were in conversation, her and Rhonda, in reference to a patient.

**Question**: Nikita Molton told you –

**Answer**: Yes.

**Question**: -- on occasion that she had spoken with Rhonda and that there was some concern voiced by a patient that you had –

**Answer**: Been unfriendly.

**Question**: -- been unfriendly?

**Answer**: Yes.

**Question**: Okay. Anything other than that?

**Answer**: Nothing other than Dr. Stoudemire's comments.

*See id.* at 117-121.

> **Question**: Did Jo, Rhonda, or Nikita ever physically threaten you in any way?
>
> **Answer**: Physically, no, sir.
>
> **Question**: Did they ever demean or humiliate you in front of a patient?
>
> **Answer**: No, sir.
>
> **Question**: Did any of the three of them ever tell you that they thought you were racist?
>
> **Answer**: No, sir.

*See id.*

Plaintiff also relies on the testimony of Naomi Moses, a clerical employee from the same office. Plaintiff argues that Moses' testimony reflects the racial basis of the harassment that Woodruff suffered:

> **Question**: Okay. But when you say the racial talking and backbiting towards Kimberly Woodruff were constant causing unbelievable turmoil, was there anything more you mean by that?
>
> **Answer**: Just – it was just – you know, there for awhile, it got to be every single day something with Kimberly, every single day, just, you know, crazy.

*See* Doc. 26-6 at 32. But Moses could not offer specifics about what she meant by "racial talking," "backbiting," or "turmoil." *See id.* at 31-35. The only concrete example of race-related "turmoil" Moses testified about was the disagreement over Confederate statues; the issue of statues was mentioned over forty times in her

deposition.[2] *See id*. Moses also overheard Woodruff's co-workers "make comments about the white patients." *See id*. at 70. But Woodruff did not hear these comments. Instead, Moses confirms that the comments these co-workers directed at Woodruff were not racial in nature:

> **Answer**: When she would be late. You know they would make comments…
>
> **Question**: But not racial comments, correct?
>
> **Answer**: No. Just comments – it was comments like: Luke must have something going on because she got to come late. You know, just stuff like that. You know the office talk.
>
> **Question**: Okay so –
>
> **Answer**: Jealous office talk.
>
> **Question**: Right. So, it would be jealous office talk as opposed to specific racial comments?
>
> **Answer**: That – yeah, that's what I am saying.

*See id.* at 110-111. Moses volunteered that "[m]aybe they were just jealous because her and Dr. Stoudemire were close." *See id.* at 73-74.

---

[2] For example, when asked if any of the three women had made racial comments to her, Moses responded in the negative: "I mean, I was never involved in any of the racial stuff. I mean, they didn't talk racial stuff with me as far as, you now, sitting down and talking about the statue and all that." It is clear from this statement and others like it in her deposition that Moses perceived discussions about statues as racial "turmoil."

11

Defendant argues, and the Court agrees, that "Woodruff is essentially complaining about workplace antipathy demonstrated by co-workers who happen to be African-Americans." *See* Doc. 27 at 4. There is no substantial evidence in the record that Woodruff was harassed because of her race or that the harassment was sufficiently severe to change the terms and conditions of her employment. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment"). Instead, the most that a reasonable jury could conclude is that Woodruff's co-workers did not like her, made jokes and negative remarks about her, and made her uncomfortable by discussing an issue that was at the forefront of the national news. This is not an objectively hostile work environment based on race. *See generally* Eugene Volokh, *Freedom of Speech and Workplace Harassment*, 39 UCLA L. Rev. 1791, 1849 (1992) (explaining that harassment law does not ban discussion of racial or political issues in the workplace).

B. <u>Termination</u>

To the extent Plaintiff has asserted a discriminatory discharge claim based on disparate treatment, she would need to argue either that there is a convincing mosaic of circumstantial evidence suggesting that those who fired her did so for racial reasons, or that there is a similarly situated comparator who was not treated similarly

12

under similar circumstances. *See Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220 (11th Cir. 2019). She has failed to show either one.

Woodruff was actively courted by Dr. Stoudemire, an African-American woman, to join her practice at Jackson. After she joined the practice, she suffered a series of disciplinary sanctions at the hands of supervisors Penney and Brooks, both of whom are white, related to things like using incorrect abbreviations and mixing up appointment times. There is no allegation that either person treated her improperly because of her race. She was ultimately warned that she would be terminated if she continued to make mistakes. Jackson Hospital fired Woodruff after seven months of employment with four months passing between the first disciplinary meeting and the firing. Plaintiff introduces no evidence to suggest that a similarly situated person was treated differently. Although the alleged HIPAA violation that ultimately resulted in Woodruff's firing was not investigated, federal law does not protect employees from arbitrary employment practices, only discriminatory ones. *See e.g. Spidle v. Hogan*, 2014 WL 3016111, at *1 (M.D. Tenn. July 3, 2014); *E.E.O.C. v. Noble (U.S.) Inc.*, 2006 WL 373487, at *6 (W.D. La. Feb. 16, 2006). Plaintiff cites to nothing in the record that would allow a reasonable jury to infer that she was fired because of her race.

## **CONCLUSION**

Based on the above reasoning, Defendant's Motion for Summary Judgment is GRANTED. A separate judgment will be entered.

**DONE** and **ORDERED** this 30th day of October, 2019.

/s/ Andrew L. Brasher

ANDREW L. BRASHER
UNITED STATES DISTRICT JUDGE